1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8

JOHN LESTER COX,

9                         Plaintiff,

10        v.

11   MIRA NARKIEWICZ et al.,

12                         Defendant.

13

Case No. C19-1486-JCC-MLP

REPORT AND RECOMMENDATION

14                    **I.    INTRODUCTION**

15      This is a 42 U.S.C. § 1983 prisoner civil rights action. John Lester Cox ("Plaintiff"),

16   proceeding *pro se*, filed an amended complaint against several Washington State Department of

17   Corrections ("DOC") employees alleging: (1) First Amendment retaliation claims against

18   Defendants Michael Spencer and Dr. Timothy Whetstine-Richel; and (2) Eighth Amendment

19   deliberate indifference claims against Defendants Dr. Mira Narkiewicz and Spencer stemming

20   from his previous custody at the Airway Heights Corrections Center ("AHCC"). (Pl.'s Compl.

21   (Dkt. # 6) at 10.) On July 13, 2020, Defendants filed a motion for summary judgment

22   ("Defendant's Motion") arguing that Plaintiff failed to state claims upon which relief could be

23

granted, and in the alternative, Defendants are entitled to qualified immunity. (Defs.' Mot. (Dkt. # 16) at 1-2, 14-22.)

Having considered the parties' submissions, the governing law, and the balance of the record, the Court recommends Defendants' Motion (dkt. # 16) be GRANTED and that Plaintiff's claims be DISMISSED with prejudice. Consequently, the Court recommends that Plaintiff's motion to compel discovery ("Plaintiff's Motion") (dkt. # 24) be DENIED as moot.

## II.    BACKGROUND

### A.    Procedural History

On September 19, 2019, Plaintiff submitted his original complaint to the Court as an attachment to his motion to proceed *in forma pauperis*. (Pl.'s Compl. (Dkt. # 4-1).) Plaintiff's original complaint alleged violations of his Eighth Amendment right to be free from cruel and unusual punishment and deliberate indifference to serious medical needs, his First Amendment right to be free from retaliation, the Americans with Disabilities Act, and the Rehabilitation Act. (*Id.* at 10-11.) On October 31, 2019, this Court declined to serve Plaintiff's original complaint due to deficiencies. (Order (Dkt. # 7).) Given the deficiencies, the Court gave Plaintiff two options: (1) Plaintiff could file an amended complaint within 30 days correcting the identified deficiencies; or (2) Plaintiff could elect to not file an amended complaint, in which case the Court would construe his silence as a request to voluntarily dismiss his deficient claims and direct that his sufficiently pleaded claims be served (*Id.* at 14-15.)

On December 12, 2019, due to Plaintiff's decision not to file an amended complaint, this Court solely allowed Plaintiff's retaliation claims against Defendants Spencer and Dr. Whetstine-Richel, and Plaintiff's cruel and unusual punishment and deliberate indifference to medical needs claims against Defendants Spencer and Dr. Narkiewicz, to proceed and dismissed

Plaintiff's remaining claims. (Order (Dkt. # 8) at 2.) On February 6, 2020, Defendants filed an Answer to Plaintiff's complaint. (Answer (Dkt. # 13).)

On July 13, 2020, Defendants filed their Motion. (Defs.' Mot.) Together with the Motion, Defendants submitted declarations from: (1) named Defendants (dkt. ## 18-19, 21); (2) Kate Ronning, a paralegal in the corrections division of the Washington Attorney General's Office, concerning Plaintiff's offender movement history (dkt. # 17); and (3) Jordan McKinney, a DOC senior secretary responsible for facilitating grievances (dkt. # 20.) On August 6, 2020, Plaintiff filed his Response along with an attached declaration. (Pl.'s Resp. (Dkt. # 23).) Defendants did not file a reply.

On August 25, 2020, Plaintiff filed his Motion. (Pl.'s Mot. (Dkt # 24).) Plaintiff's Motion seeks additional time to allow him to conduct further discovery, additional time to add defendants and claims to his complaint, and an extension of time on the dispositive motion deadline to allow him to submit a dispositive motion. (*Id.* at 5.) On September 8, 2020, Defendants filed a response to Plaintiff's Motion.[1] (Defs.' Resp. (Dkt. # 25).)

On October 2, 2020, Plaintiff filed a Surreply requesting a telephonic meeting with Defendants to discuss discovery and the potential for settlement. (Pl.'s Surreply (Dkt. # 28) at 3, 9.) Plaintiff additionally signaled an intention to amend his complaint to bring additional counts in this action should the case not settle. (*Id.* at 3-8.)

## B. Factual Background

Plaintiff is a veteran who suffers from traumatic brain injuries. (Pl.'s Compl. (Dkt. # 6) at 4, 9; Pl.'s Decl. (Dkt. # 23) at ¶¶ 2, 29.) Plaintiff has been previously diagnosed with, or

---

[1] The Court previously set a dispositive motion deadline in this matter of July 13, 2020; the same date Defendants filed their Motion. (Order (Dkt. # 14); *see* Defs.' Mot.) Plaintiff's Motion seeking an extension was filed nearly seven weeks after the dispositive motion deadline passed. (*See* Pl.'s Mot.) Because the Court recommends that Defendants' Motion be granted, Plaintiff's Motion is denied as moot.

suspected of having, multiple mental health impairments, including: (1) Persistent Depressive Disorder; (2) Unspecified Personality Disorder; (3) Post-Traumatic Stress Disorder ("PTSD"); (4) Bipolar Disorder; (5) Mood Disorder, Not Otherwise Specified; and (6) Chronic Anxiety Disorder. (Narkiewicz Decl. (Dkt. # 18) at ¶ 18.) While at SCCC, Plaintiff received mental health treatment, including pharmacological treatment. (Narkiewicz Decl. at ¶ 5; Pl.'s Decl. at ¶¶ 38-41.)

Prior to his transfer to AHCC in May 2013, Plaintiff was prescribed Celexa for his mental health impairments. (Narkiewicz Decl. at ¶ 5; *id.*, Ex. 2 (Dkt. # 18-1) at 4-5; Pl.'s Decl. at ¶¶ 38-41.) In March 2013, Plaintiff elected to discontinue using Celexa, citing worsening irritability symptoms, and his prescription was discontinued at that point in time. (*Id.*)

### i. *Treatment by Dr. Narkiewicz*

Dr. Narkiewicz is a DOC psychiatrist who served as a psychiatrist at AHCC from April 2009 through September 2018. (Narkiewicz Decl. at ¶ 2.) On June 3, 2013, Dr. Narkiewicz conducted a mental health chart review and intake screening upon Plaintiff's arrival at AHCC.[2] (*Id.* at ¶ 5; *id.*, Ex. 1 at 2; Pl.'s Decl. at ¶¶ 57, 61.) Plaintiff alleges Dr. Narkiewicz canceled prescribed medications that he was taking for his mental impairments at this time. (Pl.'s Compl. at 5.) However, Dr. Narkiewicz alleges she did not cancel any medications, prescribe any medications, or make any changes as a result of Plaintiff's review and intake screening. (Narkiewicz Decl. at ¶ 5; *id.*, Ex. 3 at 7.)

---

[2] Plaintiff alleges he was sent to AHCC to participate in a cognitive behavioral change program called "Thinking for Change." (Pl.'s Compl. at 4; Pl.'s Decl. at ¶¶ 49-51.) Plaintiff asked to be returned to SCCC but was denied. (*Id.*) Plaintiff alleges he was subsequently forced to participate in the program "under duress and threat of loss of good time and segregation for refusal." (Pl.'s Compl. at 4.)

1          In July 2013, Plaintiff filed a grievance at AHCC requesting he be treated with

2   medication for his mental health impairments. (McKinney Decl., Ex. 1 (Dkt. # 20-1) at 2.)

3   AHCC healthcare staff responded to the grievance that based on Plaintiff's recent screening with

4   Dr. Narkiewicz, he did not have a condition qualifying him for pharmacological intervention.

5   (*Id.* at 2-3, 5.) Plaintiff appealed this grievance decision. (*Id.* at 8.) Dr. Narkiewicz and an AHCC

6   Health Services manager then met with Plaintiff to discuss his grievance concerns. (*Id.* at 6;

7   Narkiewicz Decl. at ¶ 6.) At that time, Dr. Narkiewicz determined Plaintiff appeared to function

8   well, had mild symptoms of a disorder, and that he did not exhibit symptoms supporting a

9   diagnosis qualifying him for treatment with mental health medication per the DOC Offender

10  Health Plan. (Narkiewicz Decl. at ¶ 6; *id.*, Ex. 4.) Dr. Narkiewicz encouraged Plaintiff to

11  continue his mental health treatment, report new or worsening symptoms, and if his primary

12  therapist determined his symptoms had changed or worsened, Plaintiff could be referred to Dr.

13  Narkiewicz for further consideration of pharmacological intervention. (Narkiewicz Decl. at ¶ 6.)

14         In July 2015, Plaintiff was formally referred to Dr. Narkiewicz for mental health

15  treatment. (Narkiewicz Decl. at ¶ 7; *id.*, Ex. 5 at 52-54.) Plaintiff had recently undergone a

16  sentencing review board hearing and stated during his hearing that he believed pharmacologic

17  treatment for his mental health impairments would increase his chances of release. (*Id.*) Because

18  Plaintiff had managed effectively since his arrival at AHCC, and reported feeling stable, Dr.

19  Narkiewicz again determined Plaintiff did not meet the medical necessity standard for

20  pharmacological treatment for his mental health symptoms at that time. (*Id.*) Dr. Narkiewicz

21  recommended, and Plaintiff allegedly agreed, he should meet with his primary therapist to

22  review his need for treatment. (*Id.*)

23

In November 2015, Plaintiff's primary therapist recommended that he be placed on a low-dose antidepressant. (Narkiewicz Decl. at ¶ 8.) In response, Dr. Narkiewicz developed a treatment plan for Plaintiff. (*Id.*) However, Plaintiff refused to meet with Dr. Narkiewicz to discuss his treatment plan for nearly a year, allegedly because of Dr. Narkiewicz's accent. (*Id.*) In October 2016, Plaintiff finally agreed to meet with Dr. Narkiewicz to discuss his treatment plan. (*Id.*)

At an unidentified point around this same time, Plaintiff sent letters to the Washington State Governor's Commission on Disability Rights and the United States Department of Justice Civil Rights Division. (Narkiewicz Decl. at ¶ 8; Pl.'s Compl. at 6; Pl.'s Decl. at ¶ 124.) The Governor's Office subsequently contacted DOC, which resulted in DOC sending Plaintiff a letter stating that he was receiving proactive mental health care, and in the future, Plaintiff should use proper DOC channels to address his concerns. (Pl.'s Compl. at 6; Pl.'s Decl. at ¶ 145.)

Dr. Narkiewicz met with Plaintiff again in January 2017. (Narkiewicz Decl. at ¶ 9; *id.*, Ex. 9 at 115-117; Pl's Decl. at ¶ 125.) At that meeting, Plaintiff reported difficulty sleeping and irritability with others. (Narkiewicz Decl. at ¶ 9; *id.*, Ex. 9 at 115-117.) Based on his reported symptoms, Dr. Narkiewicz determined Plaintiff's change in functioning required pharmacological intervention. (*Id.*) Dr. Narkiewicz diagnosed Plaintiff with Chronic Depressive Syndrome, Not Otherwise Specified. (*Id.*) Dr. Narkiewicz discussed the potential introduction of Clonidine with Plaintiff and his primary medical provider, which Plaintiff was eventually prescribed. (*Id.*; Pl's Decl. at ¶ 126.)

Throughout the rest of 2017, Dr. Narkiewicz continued to regularly meet with Plaintiff to monitor his pharmacological needs. (Narkiewicz Decl. at ¶ 14, *id.*, Ex. 13 at 130-141.) In January 2018, Plaintiff reported to Dr. Narkiewicz that his anxiety was low and that he had made the

1    decision to terminate PTSD therapy he was receiving from Mr. Spencer due to side effects.

2    (Narkiewicz Decl. at ¶ 14, *id.*, Ex. 13 at 135-36.) In May 2018, Dr. Narkiewicz met with Plaintiff

3    twice based on his PTSD concerns, but determined he seemed stable and content with his current

4    treatment. (Narkiewicz Decl. at ¶ 14, *id.*, Ex. 13 at 139-141.)

5           In June 2018, Plaintiff again met with Dr. Narkiewicz. (Narkiewicz Decl. at ¶¶ 15-16; *id.*,

6    Ex. 14 at 143-44.) At that appointment, Plaintiff reported an increase in depression and

7    specifically requested Celexa to manage his mental health symptoms. (*Id.*) Plaintiff reported an

8    increase in anger, irritability, pain perception, and a decrease in quality of sleep since his

9    previous appointment. (*Id.*) Plaintiff was previously prescribed an antidepressant, Amitriptyline,

10   for his symptoms by his primary medical provider, but Plaintiff's prescription was discontinued

11   in March 2018.[3] (Narkiewicz Decl. at ¶ 16; *id.*, Ex. 15 at 146-48.) Dr. Narkiewicz contacted

12   Plaintiff's primary provider about restarting Plaintiff on Amitriptyline, however it appears his

13   medical provider did not ultimately restart this prescription. (*Id.*)

14          In July 2018, 45 tablets of expired Amitriptyline were recovered from Plaintiff's cell

15   during a cell search. (Narkiewicz Decl. at ¶ 17; Pl.'s Decl. at ¶¶ 169-71.) Although Plaintiff

16   previously reported using the drug in a lower dose than his medical provider prescribed, the

17   amount recovered from his cell presented a safety concern. (Narkiewicz Decl. at ¶ 17*; id.*, Ex. 16

18   at 150-52.) On July 16, 2018, Dr. Narkiewicz scheduled an emergency treatment discussion with

19   Plaintiff. (*Id.*) As a result of their meeting, Dr. Narkiewicz prescribed Celexa to Plaintiff. (*Id.*;

20   Pl.'s Decl. at ¶ 170.) Per Dr. Narkiewicz, she ultimately prescribed Celexa due to Plaintiff's

21   reported increased irritability, his aggressiveness toward other inmates, that his psychotherapy

22

23   ---
[3] Per Dr. Narkiewicz, Amitriptyline is a preferred medication over Celexa for patients with chronic pain, depression, and anxiety because it modifies serotonin and norepinephrine action, while Celexa only modifies serotonin action. (Narkiewicz Decl. at ¶ 16.)

attempts were reportedly failing, reports from Plaintiff that Celexa had been helpful in the past, and her concern over the quantity of Amitriptyline recovered from his cell. (Narkiewicz Decl. at ¶ 17; *id.*, Ex. 16 at 150-52.) This was the last time Dr. Narkiewicz met with Plaintiff before she transferred to a different DOC facility. (Narkiewicz Decl. at ¶ 17.)

> ### *ii.*    *Treatment by Defendant Spencer*

Mr. Spencer is as a psychology associate for DOC who serves as a mental health therapist for inmates. (Spencer Decl. (Dkt. # 21) at ¶ 3.) Mr. Spencer became Plaintiff's primary mental health therapist at AHCC in January 2017 and treated him through March 2019. (*Id.* at ¶¶ 4, 19; Pl.'s Compl. at 7.) At their initial meeting in January 2017, Plaintiff requested a prescription for PTSD medication. (Spencer Decl. at ¶ 5.) At this meeting, Plaintiff was reportedly uncooperative, and Mr. Spencer was unable to fully assess Plaintiff's mental health issues because Plaintiff appeared stable and did not describe symptoms that warranted a diagnosis of PTSD. (Spencer Decl., Ex. 1 (Dkt. # 21-1) at 2.)

In February 2017, Plaintiff stated he was diagnosed with PTSD and Bipolar Disorder in the past and asked for medication. (Spencer Decl. at ¶ 6; Plaintiff's Decl. at ¶¶ 130-32.) However, Plaintiff was unable to give symptoms that would warrant a diagnosis for either impairment. (Spencer Decl. at ¶ 6; *id.*, Ex. 2 at 4.) Mr. Spencer eventually terminated the interview because Plaintiff became argumentative. (*Id.*) Pursuant to the DOC Offender Health Plan, Mr. Spencer documented the incident in a report and diagnosed Plaintiff with an Unspecified Personality Disorder. (*Id.*) Mr. Spencer consulted with psychiatry regarding Plaintiff's request for psychotropic medications, and both agreed Plaintiff's symptoms did not warrant a diagnosis of Bipolar Disorder or PTSD at that time. (Spencer Decl. at ¶ 7.)

1      At some point in spring 2017, Plaintiff requested that a chaperone attend his therapy

2 appointments with Mr. Spencer. (Spencer Decl. at ¶ 8.) This request allegedly came about

3 because Plaintiff took issue with a statement Mr. Spencer included in his February 2017 report

4 noting Plaintiff had become argumentative at his appointment. (*Id.*) Plaintiff requested Mr.

5 Spencer remove the statement from his record. (*Id.*) Mr. Spencer explained to Plaintiff the

6 statement was his professional observation and that it was a permanent part of the record. (*Id.*)

7      On July 20, 2017, Mr. Spencer and Plaintiff met for their appointment, with AHCC

8 Psychologist Dr. Whetstine-Richel as a chaperone per Plaintiff's request. (Spencer Decl. at ¶ 9;

9 *id.*, Ex. 5 at 10.) Plaintiff reported that the Clonidine prescribed in February by Dr. Narkiewicz

10 had reduced his irritability and hostility. (*Id.*) During this appointment, Plaintiff allegedly wanted

11 to focus on his military career rather than discuss his current symptoms. (Spencer Decl. at ¶ 10.)

12 Mr. Spencer determined Plaintiff's symptoms did not warrant a PTSD diagnosis at this

13 appointment, but Plaintiff did not accept Spencer's assessment. (*Id.*)

14      In August 2017, Plaintiff reported he was doing well, and the Clonidine was continuing

15 to give him support and relief. (Spencer Decl. at ¶ 12; *id.*, Ex. 7 at 14-17.) Mr. Spencer

16 administered a self-report that assesses symptoms of PTSD. (*Id.*) Plaintiff's self-report revealed

17 depressive and PTSD symptoms and the affect they were having on his ability to function and

18 interact with others. (*Id.*) As a result, Mr. Spencer diagnosed Plaintiff with Persistent Depressive

19 Disorder and PTSD by history. (Spencer Decl. at ¶ 12.)

20      In October 2017, Mr. Spencer first discussed Cognitive Processing Therapy ("CPT") with

21 Plaintiff.[4] (Spencer Decl. at ¶ 14; *id.*, Ex. 9 at 21; Pl.'s Compl. at ¶ 9.) Mr. Spencer explained

22

23

---

[4] Cognitive Processing Therapy ("CPT") is a 12-week cognitive-behavioral treatment that has previously been shown to be effective in reducing PTSD symptoms related to traumatic events. (Spencer Decl. at ¶ 14.)

1    what would be involved in his participation in CPT and Plaintiff agreed to participate. (*Id.*)

2    Between October 23, 2017, and December 28, 2017, Mr. Spencer met with Plaintiff seven times

3    to provide CPT to treat his PTSD symptoms. (Spencer Decl. at ¶ 15, *id.*, Ex. 10 at 23-29.)

4    However, Plaintiff experienced issues with completing assignments required for his CPT, which

5    he attributed to medical issues and a death in his family. (*Id.*) Plaintiff also reported having

6    trouble with the Thinking for Change Program. (*Id.*) In January 2018, Plaintiff sent a kite request

7    to Mr. Spencer stating he wanted to suspend his CPT therapy until he could get on an

8    antidepressant.[5] (Spencer Decl. at ¶ 16; *id.*, Ex. 11 at 31-32.) At a follow-up meeting, Plaintiff

9    confirmed he wanted to take a break until his recently prescribed antidepressant took effect.

10   (Spencer Decl. at ¶ 16; *id.*, Ex. 12 at 34-36.)

11         In May 2018, Mr. Spencer received a kite from Plaintiff regarding his depression

12   medication. (Spencer Decl. at ¶ 17; *id.*, Ex. 13 at 38-39.) During a follow-up meeting, Plaintiff

13   reported depressive symptoms due to ADA accommodations, a prison infraction he received,

14   Memorial Day, and the pending anniversary date of a traumatic event. (*Id.*) Plaintiff was not

15   interested in resuming CPT at that point. (*Id.*)

16         In September 2018, Plaintiff again met with Mr. Spencer. (Spencer Decl. at ¶ 18, *id.*, Ex.

17   14 at 41-44.) Mr. Spencer diagnosed Plaintiff with Persistent Depressive Disorder, noting

18

19   _____

20   CPT is endorsed by the U.S. Department of Veterans Affairs and Defense, as well as the International
     Society of Traumatic Stress Studies, as a best practice for treating PTSD. (*Id.*)

21   [5] The CPT program allegedly required Plaintiff to focus on the events causing his PTSD, which Plaintiff
     alleges triggered PTSD episodes. (Pl.'s Compl. at 9.) When Plaintiff informed Spencer that he was

22   decompensating, Spencer allegedly told him that he needed to change the way he processed his thoughts
     about the incidents and "get over it." (*Id.*) Spencer allegedly also told him that treatment was voluntary,
     and he could stop at any time. (*Id.*) Plaintiff was "forced" to file grievances against Spencer, and Plaintiff

23   was allegedly assured that superiors had discussed Spencer's conduct with him and that he was aware of
     his job expectations. (*Id.*)

REPORT AND RECOMMENDATION - 10

1    Plaintiff had several medical issues contributing to his depression and PTSD symptoms. (*Id.*)

2    Plaintiff reported his medications were working well to manage his symptoms and that he

3    wanted to eventually resume CPT therapy. (*Id.*) On March 5, 2019, Plaintiff and Mr. Spencer

4    met for a final time and Mr. Spencer created a treatment plan. (Spencer Decl. at ¶ 18; *id.*, Ex. 15

5    at 46-47.) Plaintiff indicated he was not ready to resume CPT therapy at that point and that he

6    wanted to treat his symptoms through pharmacology. (*Id.*)

7                    iii.    *Treatment by Dr. Whetstine-Richel*

8            Dr. Whetstine-Richel is a DOC psychologist who has served as a psychologist at AHCC

9    since 2015. (Whetstine-Richel Decl. (Dkt. # 19) at ¶ 2.) In November 2017, Plaintiff submitted a

10   prison grievance regarding his PTSD treatment. (*Id.* at ¶¶ 9-10; McKinney Decl., Ex. 3 at 28.)

11   During the investigation of the grievance, DOC asked Dr. Whetstine-Richel to provide

12   information on Plaintiff's treatment. (Whetstine-Richel Decl. at ¶ 10.) At the end of February

13   2017, Dr. Whetstine-Richel reviewed Plaintiff's medical history, created a report detailing

14   Plaintiff's treatment history, and provided a probable clinical picture that could assist with the

15   grievance response. (Whetstine-Richel Decl., Ex. 4 (Dkt. # 19-1) at 85-89.)

16           Dr. Whetstine-Richel later received a kite from Plaintiff regarding his authored report.

17   (Whetstine-Richel Decl. at ¶ 11; Pl.'s Decl. at ¶¶ 140-43, 157-59.) Plaintiff took issue with a

18   sentence in the report that stated his "reported military record has been suspected of being

19   embellished." (Whetstine-Richel Decl. at ¶ 11.) Dr. Whetstine-Richel had included a statement in

20   his report that records indicated Plaintiff had been trained as a cook in the Marines, which

21   conflicted with his claim he was a sniper. (*Id.* at ¶¶ 11-12.)

22           Dr. Whetstine-Richel eventually received additional kites where Plaintiff expressed

23   concern about references to his felony convictions in the report. (Whetstine-Richel Decl. at ¶ 16.)

At the time, Dr. Whetstine-Richel believed separate counts of Plaintiff's criminal sentence were considered separate felonies, but upon review, determined he inaccurately captured Plaintiff's felony convictions. (*Id.*) Dr. Whetstine-Richel informed Plaintiff this was an unintentional error and indicated he would correct the error in the document. (*Id.* at ¶¶ 15-16; Pl.'s Decl. at ¶ 144.) However, Dr. Whetstine-Richel later discovered correcting the error regarding Plaintiff's felony convictions was not possible.[6] (*Id.* at ¶¶ 16-17.)

### C.    Plaintiff's Claims

Plaintiff's first claim alleges that Defendants Spencer and Dr. Narkiewicz violated his Eighth Amendment right to be free from cruel and unusual punishment, and deliberate indifference to medical needs, due to how Defendants managed his PTSD symptoms. (Pl.'s Compl. at 10.) Plaintiff alleges he was denied access to medication for his PTSD symptoms, and as a result, became more confrontational, hostile, and violent with both staff and inmates. (*Id.* at 5.) Plaintiff additionally alleges he was repeatedly infracted, segregated, and terminated from his prison job for threatening, intimidating, and becoming physically violent with staff and inmates due to being without his PTSD medication. (*Id.*)

Plaintiff's second claim alleges First Amendment retaliation violations on the basis that Defendants Spencer and Dr. Whetstine-Richel allegedly authored false reports about Plaintiff after he contacted outside agencies. (Pl.'s Compl. at 10.) Specifically, Plaintiff takes issue with Mr. Spencer's documentation that Plaintiff became "argumentative" during an appointment after Mr. Spencer "intentionally triggered aggressive responses from [Plaintiff], and then terminated the session." (Pl.'s Compl. at 7, 10.) Plaintiff additionally takes issue with Dr.

---

[6] Dr. Whetstine-Richel acknowledges in his declaration that the correction of a medical record consists of including an addendum to the original record, correcting the erroneous information. (Whetstine-Richel Decl. at ¶¶ 16-17.) However, because the report in question does not exist in Plaintiff's official medical file, it could not be corrected, which Dr. Whetstine-Richel later explained to Plaintiff. (*Id.* at ¶ 17.)

Whetstine-Richel's documentation in a report that allegedly accused Plaintiff of "embellishing his military record, lying about his PTSD history, and falsely stated that [Plaintiff] had eight felony convictions of a violent nature." (*Id.*)

## IV.     LEGAL STANDARDS

### A.     Summary Judgment

Summary judgment is appropriate when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving party bears the initial burden of showing the Court "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. The moving party can carry its initial burden by producing affirmative evidence that negates an essential element of the nonmovant's case or by establishing that the nonmovant lacks the quantum of evidence needed to satisfy its burden at trial. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). The burden then shifts to the nonmoving party to establish a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court must draw all reasonable inferences in favor of the nonmoving party. *Id.* at 585-87.

Genuine disputes are those for which the evidence is such that a "reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 257. The opposing party must present significant and probative evidence to support its claim or defense. *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991). "The mere existence of a scintilla

of evidence in support of the non-moving party's position is not sufficient[]" to defeat summary

judgment. *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). In addition,

it is the nonmoving party's responsibility to "identify with reasonable particularity the evidence

that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (quoted

source omitted). The Court need not "scour the record in search of a genuine issue of triable

fact." *Id.* (quoted source omitted); *see also* Fed. R. Civ. P. 56(c)(3) ("The court need consider

only the cited materials, but it may consider other materials in the record.").

A verified complaint, like Plaintiff's, "may be treated as an affidavit to oppose summary

judgment to the extent it is based on personal knowledge and sets forth specific facts admissible

in evidence." *Keenan v. Hall*, 83 F.3d 1083, 1090 n.1 (9th Cir. 1996) (internal quotations

omitted); *see also Jones v. Blanas*, 393 F.3d 918, 922-23 (9th Cir. 2004); *Lopez v. Smith*, 203

F.3d 1122, 1132 n.14 (9th Cir. 2000) (en banc). But allegations that are based merely on

Plaintiff's belief are insufficient to oppose summary judgment, as are unsupported conjecture

and conclusory statements. *See Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107, 1112 (9th Cir.

2003); *McElyea v. Babbitt*, 833 F.2d 196, 197-98 n.1 (9th Cir. 1987) (per curiam).

**B.    Section 1983 Claims**

To state a claim for relief under 42 U.S.C. § 1983, a plaintiff must show: (1) he suffered a

violation of his rights protected by the Constitution or created by federal statute; and (2) the

violation was proximately caused by a person acting under color of state law. *West v. Atkins*,

487 U.S. 42, 48 (1988); *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). To satisfy the

second prong, a plaintiff must allege facts showing how individually named defendants caused or

personally participated in the harm alleged in the complaint. *Arnold v. IBM*, 637 F.2d 1350, 1355

(9th Cir. 1981). The causation requirement of § 1983 is satisfied only if a plaintiff demonstrates a

1  defendant did an affirmative act, participated in another's affirmative act, or omitted to perform

2  an act he was legally required to do that caused the deprivation complained of. *Id.* (citing

3  *Johnson v. Duffy*, 588 F.2d 740, 743-44 (9th Cir. 1978)).

4                              **V.    DISCUSSION**

5          Based on the record before the Court, there are no genuine issues of material fact

6  regarding Plaintiff's claims. *See* Fed. R. Civ. P. 56(a); *Anderson*, 477 U.S. at 248 (A disputed

7  fact is material if it "might affect the outcome of the suit under the governing law.") As

8  explained further below, Plaintiff fails to allege facts sufficient to maintain his remaining claims

9  against Defendants.[7]

10         **A.    First Amendment Retaliation Claims**

11         Plaintiff initially alleges that Defendants Spencer and Dr. Whetstine-Richel authored

12  false reports in retaliation after Plaintiff contacted outside agencies. (Pl.'s Compl. at 10.)

13  Defendants counter that Plaintiff fails to demonstrate any necessary element of a First

14  Amendment Retaliation claim against Spencer or Dr. Whetstine-Richel. (Defs.' Resp. at 17-18.)

15         The First Amendment protects prisoners' right to file grievances and to pursue civil rights

16  litigation in federal court without retaliation. *Watison v. Carter*, 668 F.3d 1108, 1114 (9th Cir.

17  2012); *Silva v. DiVittorio*, 658 F.3d 1090, 1104 (9th Cir. 2011). "Within the prison context, a

18  viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a

19  state actor took some adverse action against an inmate; (2) because of; (3) that prisoner's

20

21  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
    [7] Having decided Plaintiff's allegations fail to state claim against Defendants in the first instance, the Court
22  declines addressing whether Defendants are entitled to qualified immunity. Qualified immunity protects
    officials "from liability for civil damages insofar as their conduct does not violate clearly established
    statutory or constitutional rights of which a reasonable person would have known." *Mullenix v. Luna*, 136
23  S. Ct. 305, 308, (2015); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Here, a qualified immunity analysis
    is unnecessary because Plaintiff fails to allege facts demonstrating Defendants' actions violated his
    constitutional rights.

REPORT AND RECOMMENDATION - 15

protected conduct, and that such action; (4) chilled the inmate's exercise of his First Amendment rights; and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005).

"The prisoner must show that the type of activity in which he was engaged was constitutionally protected, that the protected conduct was a substantial or motivating factor for the alleged retaliatory action, and that the retaliatory action advanced no legitimate penological interest." *Quiroz v. Horel*, 85 F.Supp.3d 1115, 1124 (N.D. Cal. 2015) (citing *Hines v. Gomez*, 108 F.3d 265, 267-68 (9th Cir. 1997)); *see also Pratt v. Rowland*, 65 F.3d 802, 806 (9th Cir. 1995) (plaintiff bears burden of pleading and proving the absence of legitimate correctional goals for the conduct of which he complains). Additionally, "a plaintiff who fails to allege a chilling effect may still state a claim if he alleges he suffered some other harm." *Brodheim v. Cry*, 584 F.3d 1262, 1269 (9th Cir. 2009).

Absent direct evidence, retaliatory motive may be shown by the timing of the allegedly retaliatory act and inconsistency with previous actions. *Bruce v. Ylst*, 351 F.3d 1283, 1288-89 (9th Cir. 2003). Circumstantial evidence of motive that can defeat summary judgment usually includes: "(1) proximity in time between protected speech and the alleged retaliation; (2) [that] the [defendant] expressed opposition to the speech; [or] (3) other evidence that the reasons proffered by the [defendant] for the adverse . . . action were false and pretextual." *McCollum v. Cal. Dept. of Corrections & Rehab.*, 647 F.3d 870, 882 (9th Cir. 2011) (internal quotation marks and citation omitted). However, mere speculation that defendants acted out of retaliation is not sufficient. *Wood v. Yordy*, 753 F.3d 899, 904-05 (9th Cir. 2014).

Retaliation claims brought by prisoners must be evaluated in light of concerns over "excessive judicial involvement in day-to-day prison management, which 'often squander[s]

1    judicial resources with little offsetting benefit to anyone.'" *Pratt*, 65 F.3d at 806 (quoting *Sandin*

2    *v. Conner*, 515 U.S. 472, 482 (1995)). In particular, courts should "'afford appropriate deference

3    and flexibility' to prison officials in the evaluation of proffered legitimate penological reasons

4    for conduct alleged to be retaliatory." *Id.* (quoting *Sandin*, 515 U.S. at 482).

5           Plaintiff has failed to state a First Amendment retaliation claim as to either Defendant

6    Spencer or Dr. Whetstine-Richel. Here, Mr. Spencer noted he terminated a clinical appointment

7    with Plaintiff in February 2017 after Plaintiff became argumentative. (Spencer Decl. at ¶ 6; *id.*,

8    Ex. 2 at 4.) Mr. Spencer documented the incident in a report for Plaintiff's record as required

9    pursuant to DOC policy. (*Id.*) Therefore, Plaintiff's allegation that Mr. Spencer filed a false

10   report about the incident in some form of retaliation is conclusory and unsupported by the

11   record—nothing in the record demonstrates Mr. Spencer filed his report concerning his February

12   2017 appointment with Plaintiff because Plaintiff contacted outside agencies. *See Wood*, 753

13   F.3d at 904-05 (affirming grant of summary judgment where there was no evidence defendants

14   knew of plaintiff's prior lawsuit); *Hernandez*, 343 F.3d at 1112 (finding unsupported conjecture

15   is insufficient to oppose summary judgment).

16          Plaintiff additionally fails to establish that Dr. Whetstine-Richel acted with retaliatory

17   motive. Dr. Whetstine-Richel authored a report regarding Plaintiff's treatment history in

18   February 2017. (Whetstine-Richel Decl. at ¶ 10; *id.*, Ex. 4 at 85-89.) Dr. Whetstine-Richel's

19   report detailed Plaintiff's treatment history and a probable clinical picture in order to assist DOC

20   in facilitating a grievance response to Plaintiff's PTSD therapy requests. (*Id.*) As such, it is clear

21   from the record Dr. Whetstine-Richel created the report as an aid to respond to Plaintiff's

22   submitted grievance request concerning his PTSD treatment and to help establish a treatment

23   plan for Plaintiff. (*See id.*) Plaintiff's allegation that Dr. Whetstine-Richel retaliated against him

by filing false information in the report because Plaintiff contacted outside agencies is mere speculation.[8] *See Wood*, 753 F.3d at 904-05; *Hernandez*, 343 F.3d at 1112.

Accordingly, viewing the evidence in Plaintiff's favor, it is clear that Plaintiff's claims that Mr. Spencer and Dr. Whetstine-Richel retaliated against him because he reached out to outside agencies about his mental health treatment is unsupported by the evidence in the record. The Court recommends granting summary judgment to Defendants on these claims.

**B.    Eighth Amendment Claims**

Plaintiff next brings Eighth Amendment claims against Defendants Dr. Narkiewicz and Mr. Spencer based on the way Defendants treated—or failed to treat—his PTSD. (Pl.'s Compl. at 10.) Defendants argue that they provided continual and necessary medical treatment to address Plaintiff's PTSD and that they were not deliberately indifferent to his medical needs. (Defs.' Resp. at 18-19.)

The Eighth Amendment's Cruel and Unusual Punishment Clause prohibits conditions of confinement that involve the "unnecessary and wanton infliction of pain." *Whitley v. Albers*, 475 U.S. 312, 319 (1986); *see also Ingraham v. Wright*, 430 U.S. 651, 670 (1977); *Estelle v. Gamble*, 429 U.S. 97, 105-06 (1976). A prisoner claiming an Eighth Amendment violation based on conditions of confinement must show: (1) that the deprivation he suffered was 'objectively, sufficiently serious'; and (2) that prison officials were deliberately indifferent to his safety in allowing the deprivation to take place." *Morgan v. Morgensen*, 465 F.3d 1041, 1045 (9th Cir. 2006) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). The deliberate indifference standard involves an objective and a subjective prong. First, the alleged deprivation must be, in

---

[8] Dr. Whetstine-Richel additionally notes he did not learn Plaintiff had contacted any outside agency concerning his PTSD treatment until nearly two months after he filed the report. (Whetstine-Richel Decl. at ¶ 10.)

1  objective terms, "sufficiently serious." *Farmer*, 511 U.S. at 834. Second, the prison official must

2  "know of and disregard an excessive risk to inmate health or safety." *Id.* at 837. Thus, "a prison

3  official may be held liable under the Eighth Amendment for denying humane conditions of

4  confinement only if he knows that inmates face a substantial risk of harm and disregards that risk

5  by failing to take reasonable measures to abate it." *Id.* at 835.

6      To establish an Eighth Amendment violation related to medical care, an inmate must

7  prove "acts or omissions sufficiently harmful to evidence deliberate indifference to serious

8  medical needs." *Estelle*, 429 U.S. at 106; *see also Clouthier v. Cty. of Contra Costa*, 591 F.3d

9  1232, 1241 (9th Cir. 2010). Prison officials may be deemed to have been deliberately indifferent

10 to an inmate's serious medical needs "when they deny, delay, or intentionally interfere with

11 medical treatment." *Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir. 2002) (quoted sources and

12 internal quotation marks omitted). However, a prison official may be held liable "only if he

13 knows that inmates face a substantial risk of serious harm and disregards that risk by failing to

14 take reasonable measures to abate it." *Farmer*, 511 U.S. at 847. "A 'serious' medical need exists

15 if the failure to treat a prisoner's condition could result in further significant injury or the

16 'unnecessary and wanton infliction of pain.'" *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir.

17 1992) (quoting *Estelle*, 429 U.S. at 104), *overruled on other grounds by WMX Techs. v. Miller*,

18 104 F.3d 1133 (9th Cir. 1997).

19      A difference of opinion between an inmate and medical authorities regarding proper

20 medical treatment does not give rise to a § 1983 claim. *Franklin v. Oregon, State Welfare Div.*,

21 662 F.2d 1337, 1344 (9th Cir. 1981); *see Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996).

22 Prison authorities retain wide discretion in the medical treatment afforded to prisoners. *Toguchi*

23 *v. Chung*, 391 F.3d 1051, 1058 (9th Cir. 2004) (finding mere differences of opinion between a

1  prisoner and prison medical staff, or between medical professionals regarding the proper course

2  of treatment, does not give rise to a claim under § 1983); *Jackson*, 90 F.3d at 332.

3      Here, Plaintiff has failed to establish either Dr. Narkiewicz or Mr. Spencer were

4  deliberately indifferent to his PTSD therapy. The record demonstrates that Dr. Narkiewicz

5  provided consistent care to Plaintiff since his arrival to AHCC in 2015. (*See* Narkiewicz Decl. at

6  ¶¶ 6-10, 14-17; Pl's Decl. at ¶¶ 57, 61, 125-26, 169-71.) Throughout the course of Plaintiff's

7  time at AHCC, Dr. Narkiewicz reviewed Plaintiff's health information on a routine basis,

8  provided several follow-up reviews, and suggested treatment options for his mental health

9  impairments based on her professional judgment. (*See id.*).

10      Despite Plaintiff's contentions to the contrary, Dr. Narkiewicz did not cancel or make any

11  medication changes as a result of Plaintiff's initial screening as Plaintiff elected to cancel taking

12  Celexa prior to his arrival at AHCC. (*See* Narkiewicz Decl. at ¶ 5; *id.*, Ex. 2 at 4-5; Pl.'s Decl. at

13  ¶¶ 38-41.) Though Plaintiff was not initially diagnosed with PTSD or prescribed medication by

14  Dr. Narkiewicz, Plaintiff was eventually diagnosed with a form of PTSD and ultimately provided

15  pharmacological intervention for his symptoms upon further appointments. (*See* Narkiewicz

16  Decl. at ¶¶ 9, 14; *id.*, Ex. 9 at 115-117, Ex. 13 at 130-141.) Eventually, Dr. Narkiewicz

17  prescribed Celexa to Plaintiff, though she preferred Amitriptyline, to treat his mental health

18  conditions. (*See* Narkiewicz Decl. at ¶¶ 15-17; *id.*, Ex. 16 at 150-52.) Nevertheless, the record

19  clearly demonstrates that Dr. Narkiewicz provided appropriate treatment for Plaintiff's PTSD

20  while he was at AHCC and there is no indication she was deliberately indifferent to his need for

21  treatment.

22      It is additionally clear from the record Mr. Spencer actively reviewed, assessed, and used

23  his professional judgment in treating Plaintiff's PTSD as his diagnosis developed over time.

1   (Spencer Decl. at ¶¶ 5-10, 12, 14, 18-19.) Upon Mr. Spencer's first few appointments with

2   Plaintiff, Plaintiff's symptoms initially did not warrant a diagnosis of PTSD, and therefore,

3   Spencer determined Plaintiff was not eligible for medication at that time. (*Id.* at ¶ 5.) During a

4   February 2017 appointment, Plaintiff did not agree with Mr. Spencer's assessments and became

5   argumentative, which forced Mr. Spencer to terminate the appointment and delayed further

6   appointments. (*See id.* at ¶¶ 6-7, Ex. 2 at 4.) However, once Mr. Spencer was able to perform

7   additional assessments, he was able to diagnose Plaintiff with Persistent Depressive Disorder and

8   PTSD by history. (Spencer Decl. at ¶ 12; *id.*, Ex. 7 at 14-17.) Mr. Spencer was then able to

9   provide Plaintiff PTSD treatment, which included CPT therapy that Plaintiff engaged in until he

10  chose not to. (Spencer Decl. at ¶¶ 14-15, 17.) Consequently, the record demonstrates that Mr.

11  Spencer provided appropriate medical care to address Plaintiff's PTSD and that he was not

12  deliberately indifferent to his need for treatment.

13      Moreover, although Plaintiff disagreed with Dr. Narkiewicz and Mr. Spencer's treatment

14  assessments regarding his PTSD, a difference of opinion between an inmate and his treating

15  provider fails to state claim. *See Jackson*, 90 F.3d at 332; *Franklin*, 662 F.2d at 1344; *Toguchi*,

16  391 F.3d at 1058. In this case, it appears Plaintiff merely disagrees with his providers about his

17  PTSD therapy and how it was treated based on Defendants developing decisions while Plaintiff

18  was at AHCC. Accordingly, the Court recommends granting summary judgment to Defendants

19  on Plaintiff's Eighth Amendment claims.

20                      **V.    CONCLUSION**

21      For the foregoing reasons, this Court recommends Defendant's Motion (dkt. # 16) be

22  GRANTED, and that this matter be DISMISSED with prejudice. Furthermore, this Court

23

recommends Plaintiff's Motion (dkt. # 24) be DENIED based on the Court's recommended dismissal of this matter. A proposed order accompanies this Report and Recommendation.

Objections to this Report and Recommendation, if any, should be filed with the Clerk and served upon all parties to this suit by no later than **twenty-one (21)** days after the filing of this Report and Recommendation. Objections, and any response, shall not exceed twelve pages. Failure to file objections within the specified time may affect your right to appeal. Objections should be noted for consideration on the District Judge's motion calendar **fourteen (14)** days after they are served and filed. Responses to objections, if any, shall be filed no later than **fourteen (14)** days after service and filing of objections. If no timely objections are filed, the matter will be ready for consideration by the District Judge on **December 4, 2020**.

The Clerk is directed to send copies of this Report and Recommendation to the parties and to the Honorable John C. Coughneour.

Dated this 10th day of November, 2020.

MICHELLE L. PETERSON
United States Magistrate Judge